Okay, well, our next appeal is 21-2007, and it's Thomas Barwin v. Village of Oak Park, and Ms. Major. Thank you, Your Honor. May I please report? My name is Ruth Major. Good morning. I represent Thomas Barwin, who's the plaintiff repellent in this case. Good morning. I'm sorry. Good morning. Good morning. Mr. Barwin dedicated his entire career to public service. He began his career working as a police officer and then spent decades working as a manager for different villages in different states. In 2006, he was recruited. He was working in Michigan as a village manager. You know, Ms. Major, I'm going to stop you because we have really read these briefs, and so I'm going to start you off with a question, okay? Okay. Great. Okay. Because what I want to focus on is the claim that's presented by the second amended complaint, which strikes me as the stronger of the two claims you address. And can you tell me why you frame that claim as one for breach of duty of good faith and fair dealing as opposed to a straightforward breach of Section 19A? Are you assuming that once Mr. Barwin was forced to resign, he could no longer invoke his right to benefits under Section 19A? No. And in fact, I think that the claim, and I was thinking a lot about this, it really is sort of a hybrid of a breach of contract just based on a violation of that provision and a breach of the implied covenant of good faith and fair dealing. In this particular instance, with regard to that provision, he did timely request the right to purchase the pension credits. He was still an employee. He had not ended his employment. And what happened was the village did not even, he was told by Mr. Pope, who was the chairman of the board of Oak Park, that his request would be presented to the board for a vote. And in the entire past, they had always granted those requests to purchase pension credits so that you can bridge that period of time where you haven't yet met the vesting period. When he was told that it would be presented to the board, it never was. The board never voted on it. They never allowed him to purchase his pension credits and his employment ended. It is a breach of contract claim. The allegations do set forth breach of contract that Section 19, as you pointed out, Your Honor, and it also does allege breach of implied covenant of good faith and fair dealing to the extent that they claim that they've decided to change their practice. We're changing our practice now after 20 years, right now with Mr. Barwin, and we're not even going to present it to the board for a vote. So it does really cover both of those claims. So that claim, that's one of his claims, and we think that is a strong claim. He had that provision in there that allowed him to get the highest level of benefits enjoyed by people at his level, which used the word like department heads, that type of thing. Ms. Major, your breach of contract claim is really based on the practice language in Section 19A. Exactly. And looking at the record, the only evidence in the record is that the last time this was allowed was in 2001, which was five years before your client started and approximately 11 years after he had been there. How can, given that that is the only evidence and it's undisputed, how can that amount to a practice if it was 11 years ago? Well, it's a practice because every time the issue came up over the course of 20 years, and if you may recall from the briefs, he was told that that was what they did when he was hired in 2006. Okay? But there was a clause in here that really took out any prior, there was an integration clause that really took out any prior oral conversations as being part of the contract. So I'm looking at, this is a summary judgment and evidence of practice. And how can it be that something that took place 11 years ago, the last time that happened, that that can be considered a practice? Well, because of the nature of, you know, a practice is, you know, the frequency of a practice is going to be driven by the nature of what the practice applies to. So there might be some practices that it happens daily because that's the nature of the activity. This is a practice because every time the village has this issue come up, every time an administrator isn't going to make the eight-year vesting period, the village has, in every case, allowed the employee to purchase the pension credits. Okay. For purposes of Section 19A, how many department heads and similar level employees were there in Oak Park during his tenure? I mean, I would think it was a relatively small number. It was. And I apologize, I can't give you the exact number, but I think it was a small number. And I think a lot of the administrators get the eight years. They make it to the eight years. So they don't have a need to purchase. The practice just involves administrators at that level, department heads and higher, who don't make the eight years. You described your claim as a hybrid claim. I'm not so sure it is. And my question for you is, if we agree with the district court on the interpretation of 19A and practice, can you still go forward on your implied faith of implied covenant of good faith and fair dealing? If you agree with the court on the language? On Section 19A, that you have not established practice entitles him to purchase these pension credits. Do you still have an issue? Do you still possibly win on implied faith? Well, our position in this case is that the breach of the implied covenant of good faith involves the totality of the circumstances. It also involves his termination. Because one of the arguments that the defendant has made throughout is that he's employed at will. We don't dispute. And every employment lawyer hears those words in their sleep. Any reason, no reason. But we also know that that principle has carve-outs. You can't terminate somebody because of their race. You can't terminate them because of their gender. You can't terminate a whistleblower. So there's carve-outs. And Illinois has recognized that in common law for whistleblowers. And then they passed the whistleblower statute. Here, Illinois has recognized in the specific instance of a pension that the implied covenant of good faith applies to employment in the context of a pension. The case was Stevenson versus ITT Harper. It's cited in our brief. In that case, the executive lost because the court said the employer had a good reason for what they were doing. They had, in other words, a legitimate reason, which is different than this case. We've listed numerous reasons that call into question everything they did from start to finish in terminating him, violating the Open Meetings Act. But in order to bring an implied covenant of good faith and fair dealing under Illinois law, the employer has to have engaged in avowedly opportunistic conduct. That's exactly right. And the district court found that expecting to stay for another two and a half years to get your pension and terminating somebody in advance of that is not avowedly opportunistic because it's two and a half years away. Right. So what we addressed very thoroughly, I think, in our reply brief is that timing is not an element of opportunistic discharge. It can be evidence of it. We see a lot of retaliation cases, wrongful termination cases, where the only evidence the employee has is timing. The termination occurs the day before something or something to that effect. But timing is not a required element. If a plaintiff has other evidence that shows that the motivation for the termination was bad faith to prevent them from getting a benefit that they've been working for, and on this point I would say not only was Mr. Barwin working for six years, 75 percent of the way toward getting this, and this is a big carrot in public employment, as I'm not sure everybody knows, is the pension benefits. He was working, he had this carrot laid out there for him that he was going to, you know, if he kept in, stayed eight years, you know, he got this, and he stayed to try to get that because if he had to purchase it would be more expensive. So the longer he works, you know, he can get that. And it was something he brought up from the get-go. Isn't that so? That's exactly right. He talked about it while he was interviewing with the village before he accepted the position, quit his job in Michigan, and moved to Oak Park. He talked to them about this. And the interesting thing about this case too is that Mr. Barwin was also paying toward this pension. He paid $50,000 during the course of his employment toward this that he completely lost. How did he lose that given the severance, the $107,000? Well, the severance is a different entitlement he had. That was just a separate contract provision that he had. He had a right to severance even under these circumstances because there's a provision that says essentially if the board votes to force you out and you resign because of that, you get your severance. And that's in the contract. It's 9D. Under 9D, if they essentially force him out by voting that they're going to, you know, terminate his employment or something to that effect, he can resign and still get his severance, which is what happened here. What happened to the money he was paying in? The Oak Park has that. That's my understanding. Oak Park has it. It's in their funds now. And they paid approximately $150,000. Part of what he negotiated was that they would pay 10% of his salary. He would pay 4.5%. They paid approximately $150,000 or something to that effect, close to with compounded interest. So they have this $300,000 that were benefits he was working for as part of this understanding. And he doesn't have any of it. And from start to finish, they disinvited him to the meeting. They disinvited the village attorney. They disinvited the elected city clerk. The facts are undisputed about the language at the meeting that we can't for him to retire. Right. Right. That's a transcript. That's a transcript we received from them. And they try to say, well, that means we were just saying we can't afford to have a bad performer who's only been there six years, but we can afford to have a bad performer stay for three years who's been there 12 years. That makes no sense. If you're a bad performer, you're going to get rid of a bad performer, okay? You're not going to say, let's leave the bad performer in because they've been here 12 years. The big difference is that the 12-year employee, which Hodges used in his example, has already vested. So if a 12-year employee stays another three years, there's no added burden on the village. But if Mr. Barwin were to stay three years, there would be an added burden because he would vest. And then from that point on, he would get his pension benefits. Plus, if they terminate Barwin, they do keep that money that's been contributed. It goes back into the pension pool for the other employees. And I know you've read the briefs, the facts about the violations of the Open Meetings Act and all the other things that occurred here. They tried to say it was his performance. And a couple of really important points on that is that, one, he had just gotten a raise. That's one of the important points. Two, they had a personnel committee whose sole purpose, it was a subcommittee of the board, the subcommittee's sole purpose was to address performance issues with Mr. Barwin. In 2011, the year before he was terminated, they never once met with him to address a performance issue. They also had a tool they used. They would give an employee who was having performance issues a mid-year. They never gave a mid-year in 2011. And they just had a survey from the citizens of Oak Park. It was terrific. It was very positive about how life was in Oak Park, which is, you know, he's the village manager. So, you know, this is not, you know, just to go back, Stevenson is the case. Talking about the termination, Stevenson versus ITT Harper is where the court recognizes a bad faith claim in the context of an employee who misses out on a second case, both first districts. This court acknowledged the same thing in Wilson, okay? So this has been the history. There is a claim for bad faith involving pensions, and it's when the employer is trying to prevent the employee. They terminated him for any other reason that was legitimate or whatever reason. I wouldn't be here, but we're here because they terminated him because of that and because they didn't even consider his request to purchase the pension credits. I see my time is up. If there's any questions. It is. Okay. I will, however, give you some rebuttal time. Okay. Thank you. Because this is one hot bench. Okay. Okay. Thank you. Thank you. All right. Judge Rofner, I'm sorry. Can I interrupt for just a request? We're in the courtroom here, and if those who are not arguing the case wouldn't mind putting their masks back on, we would certainly appreciate it. I'm sorry to interrupt you, Judge Rofner. I know you can't see the courtroom, but there are various individuals in the audience who aren't wearing masks, and I know our orders haven't always been clear, but we would certainly be more comfortable if they put their masks back on, please. I'm very grateful that you mentioned that, Judge St. Eve. Put your masks on now, and you are all sentenced to wear them. Thank you, Judge Rofner. In fairness to the audience, at least I was told before I walked in that we could have our masks on. We would feel more comfortable if they were put on, so I'm not putting blame on anybody. I'm just requesting if you're not arguing and your case isn't up before the court, if you wouldn't mind putting them back on, please. And you should keep in mind that Judge St. Eve is married to the world. I won't comment on exaggeration, but I'll pass that on to him. He'll appreciate that. Dr. Howard Christman. Okay. Thank you, Your Honors. May it please the court, my name is Michael Warner, and I represent the Department of Health and Human Services. I have a question for you, Judge St. Eve. I'm sorry to interrupt you, but I just have to ask you this. When we're talking about whether a practice exists as to a particular benefit, isn't it relevant how many employees can ask for a practice? I mean, employers might be more situation-dependent. You know, they occur infrequently. But it seems to me, okay, that there can be a practice either way. Judge Roland didn't think that five requests made over the course of decades could suffice to establish a practice. But why would that be so if the issue only comes up infrequently and the requests were always, always granted? And keep in mind that the last request for a purchase of pension credits was made five years prior to Mr. Barwin's hiring. But Village President Pope specifically referenced the granting of that request when Mr. Barwin expressed concern about his pension rights. So bottom line, couldn't a fact finder construe Mr. Pope's statement to Mr. Barwin as a description of what current practice was at the time of Mr. Barwin's hiring? So there's several questions in your questions. I'll try and address each in turn and I'll address the last question first. First off, as Your Honor pointed out, whatever was said between Mr. Barwin and Mr. Pope during the negotiation of the contract is barred from consideration under the merger and integration clause, particularly because the language of Section 19A, when you read it as a whole, is unambiguous. And that also points out in terms of interpreting the intent of the parties here, if that discussion had occurred and if it was so important to Mr. Barwin that he be guaranteed the right, if he didn't stay with the Village for eight years, the minimum eight years, to purchase those pension credits, he should have asked for it and asked for that language to be included in the agreement. He did not. And what we are left with is language in the agreement that says Mr. Barwin would be entitled, well, first of all, what we are left with is Mr. Barwin has two forms of pension benefits that are explicit in the agreement. Number one, both he and the Village contributed to an Illinois Municipal Retirement Fund pension on his behalf, and that's a requirement under Illinois law for a municipal employee. It was mandated by law that both the Village and Mr. Barwin make those contributions. And contrary to what Ms. Major said, those funds don't go to the Village. Those funds go to the Illinois Municipal Retirement Fund. I also believe there is... They sure don't go to him, right? In point of fact, and I'm not an expert on Illinois Municipal Pension Law, but it's my understanding there is a process where he could actually obtain some sort of refund for the funds he contributed if he's no longer in Illinois or eligible for pension. But they certainly do not go to the Village. And the Village also contributed a substantial amount of money that remains with Illinois Municipal Retirement Fund. He also received a second pension benefit, an ICMA benefit. I'm not sure the acronym, but I think it's International City Managers Association. It's a private defined contribution fund similar to a 401k that's available for city managers, village managers, municipal employees. That was a request that was granted to Mr. Barwin that he specifically asked for to cover his concerns about his retirement. That is not necessarily something that the Village does for all employees, and it is not required to do that. So those were the explicit pension benefits in his agreement. And then we are left with this Section 19A, kind of a generic catch-all phrase that says he is also entitled to the highest level of benefits that are enjoyed by department heads or other equivalent level employees by practice. Also by policy, but there's no claim that there's a policy issue in this case. With respect to that language, Judge Rovner, I agree with you in theory that the amount that this, the number of times this request comes up is relevant to defining a practice, but I also think the timing is very relevant. A practice is something that happens over and over again, is recurring and customary. If it's, this is a sporadic request that rarely if ever comes up, there can never be a practice, frankly. Particularly when the last time this came up was five years prior to Mr. Barwin started employment. The other part of Section 19A that is important here, and I believe dispositive, is that it's, Section 19A specifically says that it applies, that Mr. Barwin is entitled to the highest level of benefits that are enjoyed are enjoyed as used in this phrase in common language means as are currently enjoyed while Mr. Barwin is employed. It doesn't say as have been enjoyed or were enjoyed in the past. No, but you see, I am thinking as I sit here that the integration clause shouldn't preclude consideration of Pope's statement as evidence of a practice. I think his statements are relevant because they brought the prior practice up to the date of the time of Barwin's hiring. He specifically inquired about the point and Pope describes what the practice was. And so the fact that had been five years since the last time a request to purchase pension credits have been granted doesn't matter because Pope was effectively describing it as an ongoing practice. Your Honor, I don't think in terms of looking at extrinsic evidence you even get to that point because I do think when you read the phrase as a whole regarding benefits that are enjoyed by to benefits that are enjoyed while the contract is in effect and while Mr. Barwin is an employee, this is in effect, as pointed out in our brief, a variation on what you see in a lot of contracts, the most favored nations clause where a customer or in this case an employee, again the top employee in the village, wants to make sure he's getting as good of a deal as everybody else in the village because he's a village manager. He's entitled to that to get the same level of benefits as everybody else. So it's really very much perspective looking. If benefits change during his employment, even if it's not specified. No one ever said to him, you know, at any time during all these years they could have said to him, you know, what Pope told you, we've changed that. We're not doing that anymore. They never did. They had every opportunity in the world to do it. And just also, you know, in that second amended complaint, even without Pope's statement, we have Barwin's allegation that he independently confirmed what Pope had told him about his has been admitted to by the village. But I do think Pope's statement carries significant weight as to evidence of there being an ongoing practice. You know, so I don't know. Let me broaden the inquiry so that we can also get to the implied covenant questions. What were Barwin's reasonable expectations here? Did he have a reasonable expectation that his pension would invest if he stayed for eight years? So under the agreement itself, and we have to look at the agreement itself, the agreement provided that as long as he was employed, the village would make contributions to IMRF, he would make contributions to IMRF, the village would also make contributions to ICMA. He also had a reasonable expectation that he could be terminated for any reason at any time. So let's stop there. Have you fully described his reasonable expectations? The one missing piece is if he was terminated without cause, he did have a reasonable expectation that he wouldn't get paid nine months of severance, which the village did. So if he had a reasonable expectation as regards his pension, at least, that he'd be making the contributions, the village would be making these two types of contributions. Then if we accept that the village fires him for the sole reason of preventing, of stopping him from hitting that eight-year mark, why would that bad faith of a discretionary power that the village had, why would that not deprive him of his reasonable expectations about the pension? Because that was not a reasonable expectation. He did not have a reasonable expectation to work for the village for a sufficient amount of time to actually get a pension. Under the language of the contract, he had a reasonable expectation that contributions would be made as long as he was employed, and that if he was terminated, he would get severance. But did he have a reasonable expectation that if he did work the full eight years and he was not terminated, his pension is protected? Well, that would not be an expectation under the contract itself, but that under the Illinois state law, he would have had that expectation. And then if the village fires him for the sole reason of preventing that from coming to pass in its full discretion, is that bad faith an issue here? No, it is not. As Judge St. Eve pointed out, bad faith under Illinois law doesn't mean just an unfair reason or a reason that doesn't rise to the level of cause or is not a good reason for terminating somebody. The case law is very clear. Going back to law, in terms of a violation of implied covenant good faith and fair dealing, the plaintiff has to show opportunistic conduct that upset the reasonable expectations of the parties. Because the contract could be terminated at will, when Mr. Barwin signed the contract, it was not reasonable for him to have a contractual expectation that he would be employed for eight years. So it's your position that even if the firing, Mr. Barwin was That would still be proper under Illinois law. And if you look at the cases cited in both parties' briefs, there is no case where the implied covenant of good faith has been used to restrict the manner in which an employer, the reasons that an employer can use to terminate an at will employee. What the cases hold is that a timing of termination or the changing of some sort of rule may bring up the implied covenant of good faith, for instance, in the pension situation. If somebody has done, literally done, all the work that they're required, they put in all the tenure that they're required, and then the day before they vest, the day before, not two and a half years, the day before they vest, the employer terminates them, that does not preclude the employer from terminating them. That may affect whether the employee is eligible for the pension and eligible for that benefit. Similarly, the other case cited deals with sales commissions. If a commissioned employee does absolutely, there's a rule that entitles you to commissions if you do certain things. If the employer, if the employee does everything that they need to to earn that commission, and then right before the commission is paid, the employer changes the rules, it doesn't mean that the employer can't change the rules, it just means that as to that particular sale, the employee may still get the benefit of the sale and the commission. You cannot use the implied covenant of good faith to override a at will termination provision. I think that's particularly the case here where the contract had a remedy for the at will termination. It provided if this happens, he gets nine months of severance. That was the agreement between the parties. And to say, well, no, there are other restrictions on the right to terminate, that just is contrary to the contract itself. And it's very clear under Illinois law, an implied covenant of good faith cannot override the terms of the contract. And I see my time is up. Well, thank you so very much, Mr. Warner. And Ms. Major, come on up. Let me just see. You had us for three minutes, and that's what we'll give you. Thank you very much, Your Honor. Just briefly, the case law does not state that the termination has to be the day before the pension best. You could have a benefit that somebody might work one year for, and it could be the day before. But that person only worked a year. My client worked six years, left Michigan in reliance on that he would have this practice, worked six years. It doesn't matter how close it is. That's only evidence, that can only be evidence. What matters is, what was the motivation? What was the motivation for terminating Mr. Barwin? And the motivation here was to prevent him from getting the benefit that he'd been working for, that he'd been told he'd be able to get if he worked or if he purchased the pension credits. And again, the Stevenson case, Illinois, first district, is very clear that the good faith applies in the employment context concerning a pension. And it's been followed by Diane, it's been followed by this court in Wilson. And as Judge Rovner pointed out, that statement by Pope, by David Pope, is very important, as is the statements that followed by the finance director, because that's evidence that shows that that practice was still in place and it was a at the time of hire and during his employment. And the only way we can understand a practice, what the practice is, the only way we can understand it is to look at extrinsic evidence. There's no definition in there. We have to look at extrinsic evidence to be able to determine what the practices are. And that's why David Pope's statement is so important. If there's no more questions, that's all I wanted to say. Thank you very much. Thank you, Ms. Major. Thank you both very, very much. Take care of yourselves. All right. Case number 4-2117.